Filed 12/10/14  P. v. Gray CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049823 |
| v. | (Super. Ct. No. RIF127539) |
| LEWIS GRAY IV, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Christian F. Thierbach, Judge.  Affirmed in part and reversed in part, with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Lewis Gray IV of first degree murder (count 1, Pen. Code, § 187, subd. (a); all further statutory references are to this code unless noted) for killing a bystander at a "Sweet 16" birthday party, 13-year-old Daveon Lee, with special circumstances to promote a criminal street gang (§ 190.2, subd. (a)(22)) and a previous conviction of first degree murder (§ 190.2, subd. (a)(2)). The jury also found Gray guilty of conspiracy to commit murder (count 2; § 182, subd. (a)(2)), attempted voluntary manslaughter of another partygoer, Kendayl Richburg, as a lesser-included offense of attempted murder (count 3; §§ 664; 187, subd. (a)), and discharging a firearm at an occupied dwelling (count 4; § 246). The jury found the allegation that Gray committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)) to be true. The jury also found to be true Gray was a principal in the offenses on counts 1 through 3 and a principal intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)), and that on count 4, Gray personally used a firearm (§§ 667; 1192.7, subd. (c)(8)).

The first penalty phase proceeding resulted in a mistrial after the jury deadlocked 10 to two in favor of death. A second penalty phase jury also deadlocked, this time seven to five in favor of death. The prosecutor declined to seek the death penalty a third time and the trial court sentenced Gray to life in prison without the possibility of parole (LWOP), plus a mandatory, consecutive 25-year term for the firearm enhancement. The trial court also imposed a sentence of five years and six months for attempted voluntary manslaughter, and stayed under section 654 sentencing for shooting at an inhabited dwelling.

Gray challenges the sufficiency of the evidence to support his conviction for conspiracy to commit murder. He also argues the trial court erred in admitting

2

evidence he was a gunman in two similar shootings immediately preceding the charged offense, and he claims the trial court erred in failing to declare a mistrial after a gang expert referred to a firearm discovered in a search of Gray's home, after the prosecutor agreed the gun should not be mentioned. Gray also argues the trial court prejudicially erred when it failed to provide any jury instructions on the gang murder special circumstance, and he contends the trial court's attempted murder "kill zone" instructions were faulty. We agree the gang special circumstance finding must be set aside.

On postverdict matters, Gray argues the trial court mishandled receipt of the jury's initial "not true" finding on the prior murder special circumstance allegation, and should have declared a mistrial instead of allowing the jury to correct its verdict when the foreperson reread the verdict form and stated, "We want the other one." Gray also challenges imposition of the 25-year-to-life firearm enhancement, and requests that we order the trial court to amend the abstract of judgment to specify his voluntary manslaughter term is to be served concurrently with his LWOP term instead of consecutively. He also contends the trial court imposed the midterm instead of the upper term for attempted voluntary manslaughter, and requests that the abstract of judgment be amended accordingly. Apart from the true finding on the gang murder special circumstance and the attempted voluntary manslaughter conviction, we affirm the judgment in all other respects, with directions for the trial court to correct the abstract of judgment as noted below.

3

# I

## FACTUAL AND PROCEDURAL BACKGROUND

Consistent with the standard of review in which we presume the judgment is correct, we set out the facts in the light most favorable to the judgment. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229.)

Gray, an active member of a criminal street gang, and a cohort of up to six other men, "crashed" a going-away party for a graduating high school senior in Corona in July 2001. Gray and another black man in the group wore their hair in braids and had lighter complexions than their companions. They instigated a fight when they were told to leave, and in the ensuing brawl, a partygoer known as "B" pummeled Gray, who later admitted to police he felt "embarrassed" and "humiliated" when B stripped Gray of his Raiders football jersey and ejected him from the party. Gray's group fired gunshots in the air once they escaped across the street and ran away.

Gray's opportunity for revenge arose a year later at another party in Corona in October 2002. A friend called Gray from a "Sweet 16" birthday celebration to tell him B was there. Gray and several "carloads" of accomplices who were also in their early 20's met at a gas station near the party, where they heard Gray exclaim "he was excited and ready to go" "fuck B up." The group conspired to use deadly force if necessary, with one member lifting his shirt to display a handgun all could see, while uttering loudly, "'I got the backup.'" When they departed for the party, Gray wore his hair in a ponytail, as he admitted and other incidents showed was his style.

The group assembled outside the party, but the birthday girl's father and host denied them entry, recounting at trial, "[T]hey just looked like a bad element. You know, you just go with your gut feeling. They were not — they were not coming there to have a good time." The host stepped in front of Gray when Gray tried to walk past him, and the host saw Gray's ponytailed companion reach toward a gun the host believed Gray had tucked into his back waistband, but Gray brushed the hand away and instead

4

employed a ruse. He told the host his sister was inside the party and had to go home. When the host retreated inside to have the disc jockey page the girl to no avail, Gray and three companions jumped a fence into the home's side yard, yelling "This is motherfucking Hoover." They muscled their way through a garage side door into the party, and knocked B to the ground, but scattered back outside when the host and his brother charged them.

Someone activated the large garage door, which opened to reveal Gray and two of his companions armed in front of the house and garage. Two witnesses placed Gray's brother Mario on a side walkway, and another noted Gray was squatting in front of Mario and firing into the garage, and a third gunman stood across the street. Witnesses heard multiple guns firing. An eyewitness identified Gray as one of the shooters. She saw him lift up his white shirt and reach for a gun before she heard at least 10 shots. Asked why she was certain in identifying Gray in a photo lineup and at trial, she explained, "He's light-skinned, he's an attractive person that you can't forget, he has nice hair. So that's someone that's going to stand out." Gray's brother Mario also had "long, beautiful hair," which he wore in two ponytails, while Gray wore his in one. Witnesses recognized the two were "related for sure."

When she heard gunshots, Kendayl Richburg ran from the garage to an upstairs bedroom overlooking the front of the house. As she stood at the window looking down, the gunman in the white shirt who had his hair in single ponytail aimed his gun at her. Someone else in the room pulled her down to the floor as two bullets pierced the window and one struck a television inside the room.

Richburg and other witnesses later filtered down to the garage, where they found Lee in a pool of blood. An autopsy revealed a single fatal bullet had struck him just above and behind his right ear, exiting on the left side of his head. The examining pathologist explained the bullet pierced both parietal lobes of the brain, which "usually"

causes "instantaneous" death, but several witnesses saw Lee writhing in convulsions before he died.

Gray fled with his brother in a white Nissan Maxima, but stopped at a gas station and called 911 because Mario had been struck by a bullet. The responding police officer found a group of "uncooperative" young black men gathered around Mario on the ground. The officer called for an ambulance and backup. He found blood on the front passenger seat of the Maxima, but recovered no weapons. Gray wore a white t-shirt and had his hair in a long, single ponytail, while Mario wore black pants and a black t-shirt. Gray claimed they had been turned away from a party and as they were leaving, he heard gunfire and learned his brother had been shot.

In a police interview three weeks after Lee's murder, Gray admitted he had been at the party, but claimed he was a bystander in the garage when the fight began. Then he admitted he and three others had jumped the fence and confronted B, whom one of Gray's friends struck first before gunfire erupted. Gray claimed the "two dads" broke up the fight, but then he saw one of them firing a gun in a shootout with "like a pack of guys" and a "Mexican guy." Gray denied firing a gun and denied anyone in his group had yelled his gang's name during the confrontation. When the detectives told Gray they knew of similar recent shootings in Rialto and at California State University, San Bernardino (Cal State San Bernardino), Gray admitted he was familiar with those incidents, stating, "You guys, are good." Bullet casings recovered at those sites had been fired from the same .40-caliber gun used in Lee's murder, which was never recovered.

II

DISCUSSION

A.   *Evidentiary Challenges*

1.   Substantial Evidence Supports the Murder Conspiracy Conviction

Gray challenges the sufficiency of the evidence to support the jury's conclusion he conspired with his fellow gangmembers to commit murder. On appeal, we

6

must view the record in the light most favorable to the judgment below. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) The test is whether a rational trier of fact could reach the verdict on the evidence presented (*People v. Johnson* (1980) 26 Cal.3d 557, 577), not whether the appellate panel is persuaded the defendant is guilty beyond a reasonable doubt. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.) It is the jury's exclusive province to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330; see *People v. Stanley* (1995) 10 Cal.4th 764, 792 [same deferential standard of review applies to circumstantial evidence].) The fact that circumstances can be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) Consequently, an appellant "bears an enormous burden" in challenging the sufficiency of the evidence. (*Sanchez*, at p. 330.)

A conspiracy consists of an agreement between two or more people to commit an unlawful act, specific intent to commit the act, and overt action towards committing the underlying offense. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024. Circumstantial evidence may establish a conspiracy, which may ""'be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]"'" (*People v. Herrera* (2000) 83 Cal.App.4th 46, 64.)

Gray contends the evidence showed only that he and his cohort agreed to beat up B, not to shoot him or kill anyone else. Gray asserts his accomplice's display of a gun at their meeting before the attack, coupled with the statement, "I got the backup" or "I got you if anything goes down," made sense only if the primary plot was to commit an assault, not murder. In other words, the gun would not be a "backup" weapon if the group's intent was to kill B. Rather, it would be the centerpiece of their attack, yet when Gray and his henchmen confronted B in the garage, they did not draw the weapon, but only assaulted B according to their plan. According to Gray, a backup plan to kill or use

7

deadly force if the group met resistance cannot form the basis of a conspiracy because it is too contingent and remote to constitute the requisite intent for murder. Gray argues such a plan amounts at most only to implied malice murder, rather than the express intent to kill necessary for a murder conspiracy. (See *People v. Swain* (1996) 12 Cal.4th 593, 601 [implied malice murder involves conscious disregard for life in intentionally committing a dangerous act, while the express malice necessary for a murder conspiracy requires an intent to kill].)

As noted, however, we must view the evidence in the light most favorable to the jury's verdict, and a reasonable jury could conclude the evidence showed an agreement with an express intent to kill — not merely to commit a dangerous act. Specifically, the jury could conclude from the gang expert's testimony and from evidence of Gray's involvement in prior shootings that if he or an accomplice had to resort to the gun, it would not be merely to fire a warning shot or otherwise use it in a dangerous fashion, but instead to intentionally kill victims to spread fear of defendant's gang.

The jury also reasonably could conclude the group's murderous intent was neither speculative, nor remote, but instead a definitive plan in the likely event of resistance. Gray offers no authority supporting his position that a contingent plan to commit an unlawful act may not form the basis for a conspiracy conviction when the plan is implemented. Indeed, the journal article Gray cites actually supports his conspiracy conviction with the following example: "[S]eparatists who declare their independence from the United States and agree to use automatic weapons to defend their proclaimed capitol against all invaders, for instance, are properly charged with conspiring to assault federal agents, despite their lack of certainty that such agents would come in conflict with their essentially defensive precautions." (Broderick, *Conditional Objectives of Conspiracies* (1985) 94 Yale L.J. 895, 899, internal quotations and footnotes omitted.) In other words, an ostensibly defensive contingency plan to meet an attack or resistance does not preclude a conspiracy conviction.

8

Gray's claim makes little sense conceptually since a backup plan to commit an unlawful act is still an agreement to commit an unlawful act, and the overt acts here triggered the very contingency to implement the backup plan. Simply put, the evidence showed that in assaulting B, Gray and his gang expected and planned for resistance, otherwise there would be no need for the "backup" support of additional gang members or a weapon. And in carrying out the assault, they met resistance as they expected. Specifically, Gray was not able to inflict to his satisfaction the beating he envisioned for B; instead, the party host frustrated their attack, rushed to B's defense and spirited him off to the kitchen without significant injuries. The jury reasonably could conclude the gang's "backup" planning for expected and likely resistance amounted to a criminal conspiracy. Substantial evidence supports the conspiracy conviction.

2.  No Error in Admitting Prior Similar Shootings

Gray argues the trial court erred in admitting over his objection evidence he committed two similar shootings shortly before the charged offense. He contends this evidence demonstrated only a propensity to commit violent crimes, thereby violating Evidence Code section 1101, subdivision (a). While evidence of prior conduct is inadmissible to prove bad character or a criminal disposition (§ 1101, subd. (a)), the conduct may be admissible on other issues, like the identity of the perpetrator of the charged crimes, the existence of a common plan or scheme, or the intent with which the perpetrator acted in the charged crimes (§ 1101, subd. (b)). To be admissible, the charged and uncharged conduct must be sufficiently similar to support a rational inference of identity, common plan, or intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 (*Ewoldt*).) The requisite degree of similarity varies according to the purpose of the evidence.

To prove identity, for example, the charged and uncharged offenses must display a "'pattern and characteristics . . . so unusual and distinctive as to be like a

signature.'" (*Ewoldt*, supra, 7 Cal.4th at p. 403.) A common design or plan, in contrast, requires only common features "indicat[ing] the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Ibid*.) The issue of intent requires the least degree of similarity between charged and uncharged crimes. (*Id*. at p. 402.) We review the trial court's ruling under the deferential abuse of discretion standard. (*People v. Scheid* (1997) 16 Cal.4th 1, 13.)

Here, the prosecutor sought to introduce evidence of three other shootings to prove Gray's identity as a shooter in the current offense, and to prove his intent to kill and intent to engage in criminal street gang activity. The trial court admitted evidence of the first two shootings and excluded the third.

The first shooting occurred in Rialto, California, two weeks before Lee was shot and killed at the Corona party. In the Rialto shooting, a witness identified Gray among several assailants as the gunman who initiated a shooting that wounded three partygoers, Charles Barnett, Malycia Sewell, and Tyshon Harris in an unprovoked attack. A second shooter, also with lighter skin than their compatriots, resembled the initial shooter. Gray also matched the description of the initial shooter, who witnesses estimated was 180 pounds and 5'5" tall and wore his hair in ponytails. Investigators recovered bullet casings at the Rialto shooting that came from the same .40-caliber gun used in Lee's murder.

A week after the Rialto shooting, on October 5, 2002, Norris Ellington and Saeed Galloway drove to a hip-hop concert at Cal State San Bernardino. As Ellington backed his truck into a parking space, he saw five to ten black males. One of the men with lighter skin and hair in two long ponytails approached Ellington and ordered him to "[g]et out of the truck and empty your pockets, homie." Without warning, the man suddenly started to shoot, wounding Ellington twice, who was also shot by a second man. Galloway identified Gray in a photograph as "possibly the main shooter." Ten

10

.40-caliber bullet casings found at the scene matched those at the Rialto and Corona shootings, all fired by the same gun.

In a third incident, on November 1, 2002, Dan Cox was killed in a drive-by shooting in Riverside. Witnesses described the assailants as "Mexican" in appearance. The assailants drove away in a burgundy Chevy Lumina, and Gray's parents owned a burgundy Chevy Lumina at that time. Several .40-caliber bullet casings recovered at the scene matched those at the other shooting locations. The trial court excluded the third shooting and also excluded proffered evidence that a witness frequently saw Gray with guns. The witness had testified at the earlier trial against Gray's brother and other codefendants in Lee's shooting, and after the witness's testimony several unidentified assailants beat her and left her to find headless rats strewn at her doorstep. The trial court excluded the evidence absent proof Gray had engineered the beating.

The trial court explained its ruling on the Rialto and Cal State shootings as follows: "The Court feels that the Rialto shooting qualifies as admissible 1101 (b) evidence. And I will permit evidence of that shooting to come in under 1101 (b). [¶] I recognize that all 1101 (b) evidence is prejudicial. For that matter, all incriminating evidence is prejudicial to a criminal defendant. The question ultimately is whether or not the prejudicial value outweighs the probative value. [¶] In this case, given the scenario that was just described to me in terms of identifications, the Court feels that the probative value of the Rialto shooting far outweighs the prejudice that is present. [¶] [Gray] was identified as the shooter. The shell casings found match up to a gun that was used in the Corona shooting, and is therefore more probative on the issue of identifying [Gray] as one of the shooters."

The court observed, "The Cal State San Bernardino shooting is a little more problematical for me. The identification, according to the brief here, at page 3, a witness identified [Gray] as, quote, 'possibly the main shooter,' end quote. [¶] But what is compelling is that, once again, the .40 caliber shell casings found at that crime scene were

compared to the Corona and Rialto shootings and they matched. [¶] This, again, is strong and powerful circumstantial evidence that [Gray] may have been one of the shooters in Corona, and/or was certainly there at the Corona incident. Corroboration for that, obviously, comes from the mouth of Mr. Brewer, the codefendant. [¶] . . . [¶] And so the Court will rule that the Cal State San Bernardino shooting is admissible under Evidence Code Section 1101 (b)."

The court explained, however, that it would "not allow evidence of the Riverside shooting 19 days later for a couple of reasons. One, I think at that point we are starting to pile it on and it does become overly prejudicial. And two, based on the factual summary of what happened in that incident, it's just too speculative that [Gray] was involved. All we have is a burgundy Chevy Lumina. And [Gray's] parents apparently owned such a vehicle. But either way, it's just too prejudicial, so I will not allow evidence of that incident under 1101 (b)."

Gray contends the two prior shootings the trial court admitted were not sufficiently similar on the issues of identity or intent to the charged offense, and therefore amounted only to improper character or propensity evidence. The trial court did not err. On close review of the record in this case, many details in the prior shootings were strikingly similar to the charged offense, revealing a signature pattern in which Gray acted as a triggerman in unprovoked group attacks. The same handgun was used in all three shootings, in which a similar number of shots were fired: 11 in Rialto, 10 at Cal State San Bernardino, and nine in Corona. The crimes were all committed in the Inland Empire in a two-week time span by a large group, with two men of lighter complexion and braided hair acting as the gunmen. As the Supreme Court has observed, while other factors viewed individually may not be particularly distinctive, "in the aggregate, the similarities become more meaningful, leading to the reasonable inference that defendant was the person who committed all three crimes." (*People v. Medina* (1995) 11 Cal.4th 694, 748-749 (*Medina*).) The ballistics evidence is particularly compelling and "alone

12

probably would have been sufficient to justify admission of the 'other crimes' evidence." (*Ibid.*)

Gray points out that the ballistics evidence did not identify *him* as a gunman even if he was among those present at a particular shooting, but as in *Medina*, the evidence must be viewed in the aggregate. Here, the other shootings provided compelling evidence of Gray's signature role: in each, the man with his hair in ponytails and a lighter complexion joined with another as gunmen in leading the attack. It was particularly probative that an eyewitness identified Gray as the instigating shooter in the first attack and "possibly the main shooter" at Cal State San Bernardino. In the charged offense, Gray took a forefront shooting position outside the garage, and he and his brother stood out with multiple identifying characteristics as the lighter-complexioned gunmen with long hair in ponytails who "seemed to be the leaders." The strong resemblance among the incidents and the evidence of Gray's active role in each was sufficient for admissibility on the issue of the shooter's identity.

Gray suggests the evidence was more prejudicial than probative and therefore the trial court erred in overruling his objection under Evidence Code section 352 because the admission of other crimes evidence is inherently inflammatory and required him to defend himself against three incidents instead of one. But the trial court reasonably could conclude the prior offenses were highly probative to corroborate Gray's identity as a shooter, and therefore they were properly admitted. (See *People v. Karis* (1988) 46 Cal.3d 612, 638 [evidence "'damaging'" to the defense is not the "prejudic[e]" against which section 352 guards].)

Gray also challenges the admissibility of the prior shootings on the question of intent to kill, but the threshold for admissibility on intent is less than for identity. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 402 [intent requires "least degree" of similarity between other crimes and charged offenses].) Gray insists that because a reasonable jury could infer, as the prosecutor argued, an intent to kill from the multiple rounds fired in the

13

charged offense, admitting the prior incidents on the issue of intent was cumulative and erroneous. It does not appear Gray sought a trial court admonition to limit the admission of the prior shootings to identity and not other purposes, apart from the trial court's standard instruction the jury was not to consider the evidence to prove Gray was a person of bad character or had a disposition to commit crime. Nor does Gray dispute the prior attacks and manner in which they were committed was relevant to show in both the charged offense and priors a gang motive to instill fear in the community and to garner a perverse degree of respect through acts of extreme violence.

In any event, the trial court did not abuse its discretion in admitting the prior shootings to prove intent. "To be admissible to show intent, 'the prior conduct and the charged offense need only be sufficiently similar to support the inference that [the] defendant probably harbored the same intent in each instance.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1194.) The prior shootings were probative of Gray's intent and noncumulative because they showed the act of spraying bullets into the garage was not a random, unthinking reaction in the heat of an interrupted attempt to humiliate B. Rather, it was another example in a pattern of conduct showing an intent to kill by firing multiple rounds at close range in sudden attacks. The evidence illuminated the charged offense to show that it was not a spontaneous or impulsive reaction, but a deliberate murderous assault. The trial court did not err in admitting the evidence.

3.    Witness's Reference to an Unrelated Firearm Did Not Require Mistrial

Gray argues the trial court erred in failing to declare a mistrial after the gang expert referred during cross examination to a firearm police discovered in Gray's home. The prosecutor had agreed in discussions with defense counsel that the gun was not relevant and excised references to the weapon from Gray's police interview, but neglected to caution the expert not to mention it. The expert disclosed the gun in a colloquy with defense counsel concerning Gray's criminal street gang involvement at the

14

time of the charged offense in October 2002. Gray had admitted being a member of the 94 Hoovers criminal street gang in a police contact in July 2002, recorded in a Los Angeles Police Department field interview card. Defense counsel attempted to elicit whether any other evidence predating the shooting showed Gray's gang membership.

The exchange occurred as follows: [Q]: Let's talk about prior to October 2002. What's [Gray's] involvement with the gang? [¶] [A]: Prior to October? [¶] [Q]: Yeah. [¶] [A]: From my knowledge, he was being violent, possession of firearms. Those kinds of activities. [¶] [Q]: Prior to October 2002? [A]: Yes, sir. [Q]: You're basing that on the Rialto and the Cal State San Bernardino [shootings]? [¶] [A]: I believe there was a firearm found in the house, as well, during a search warrant [search]. [¶] [Q]: And that's prior to October 2002? [¶] [A]: Well, no. The search warrant was in November."

During the next recess, the trial court denied defense counsel's mistrial motion, and the court also concluded an admonition to the jury to disregard the gun would only draw further attention to the weapon. Instead, at the close of evidence, the trial court read to the jury a stipulation stating the gun was seized in the November 2002 execution of a search warrant at the home Gray lived in with his father and that forensic analysis established the gun had not been used in the charged offense, nor in the Rialto or Cal State San Bernardino shootings.

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) We review a trial court's denial of mistrial motion for abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 459.)

Gray argues a mistrial was necessary because admission of the gun found in the house "tended to show that he was a violent man who knew how to use a gun," and

15

the jury would misuse the gun to conclude he was "much more likely to have been one of the gunmen in the charged crimes." He relies on cases explaining that "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons — a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant." (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360, original italics); see also *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392 [reference to knives found in defendant's home inadmissible without a showing one may have been the murder weapon]; *People v. Riser* (1957) 47 Cal.2d 566, 577 [evidence of other weapons "tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons"].)

Given the admissible evidence of Gray's participation as a gunman in the Rialto and Cal State San Bernardino shootings, the stray reference in the gang expert's testimony did not require a mistrial. The shootings showed far more than mere possession of a firearm, and it is therefore not reasonably probable the comparatively bland gun reference prejudiced Gray. He suggests the fact the police discovered the gun within just three weeks of the shooting was particularly prejudicial, but the stipulation directed the jury to accept as a proven fact the seized gun had not been used in any of the shootings. Moreover, the Rialto and Cal State San Bernardino shootings showed his possession and criminal gun use within a similarly recent timeframe. Attacking the credibility of eyewitness accounts, Gray contends the evidence he acted as a gunman at either prior shooting was "thin," and therefore evidence of the additional gun discovered in his home was prejudicial. But as discussed, the prior shootings evidence was admissible and it was for the jury to decide whether the evidence was credible. The trial court did not err in denying a mistrial.

16

B.	*Instructional Challenges*

　　1.	The Gang Murder Special Circumstance Finding Must Be Reversed

Gray contends we must set aside the gang murder special circumstance finding because the trial court failed to instruct the jury on the issue. He is correct. The error appears inadvertent given the trial court specifically asked whether the prosecutor had included the pertinent instruction in his requested packet of instructions, and the clerk's transcript corroborates the prosecutor's affirmative answer. But the transcript does not reflect the trial court read the instruction to the jury (CALCRIM No. 736 [murder committed to further criminal street gang activity]), nor that the court gave the instruction to the jury in written form.[1]

The Attorney General suggests that omitting the instruction was harmless error. Omitting a jury instruction does not rise to the level of structural error where the "omission 'neither wholly withdrew from jury consideration substantially all of the elements . . . , nor so vitiated all of the jury's findings as to effectively deny defendant[] a jury trial altogether.' [Citation.]" (*People v. Mil* (2012) 53 Cal.4th 400, 415 (*Mil*).) Here, the jury considered and resolved under other instructions several of the gang murder special circumstance elements, including whether Gray intentionally killed the victim and whether Gray actively participated in a criminal street gang at the time of the offense. Consequently, omitting the instruction is not reversible per se as structural error.

But as the high court explained: "where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding," a reviewing court "should not find the error harmless." (*Mil*, *supra*, 53 Cal.4th at p. 417.) Put

---

[1]	In relevant part, CALCRIM No. 736 provides: "To find this special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed Daveon Lee; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; AND [¶] 4. *The murder was carried out to further the activities of the criminal street gang*." (Italics added.)

17

another way, "instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence." (*Ibid.*; e.g., *People v. Odle* (1988) 45 Cal.3d 386, 415-416 [impossible to conclude the defendant did not know murder victim was a peace officer].)

Here, whether Gray committed the murder to further his gang's criminal activities was a contested question for the jury to resolve. Omitting the gang murder special circumstance instruction improperly removed this issue from the jury's consideration. Properly instructed, the jury reasonably could have concluded Gray killed Lee incidentally in a personal vendetta against B, without giving thought to his gang's interests. Consequently, we cannot say beyond a reasonable doubt that omitting the instruction was harmless.

The Attorney General suggests without authority that the jury could have located the omitted gang-purpose element based on language in the verdict form. The Attorney General notes that the gang murder special circumstance verdict form included the following language: "We, the jury in the above-entitled action, find true the special circumstance alleged under count 1 of the amended information, to wit: that the defendant, Lewis Gray, IV, did intentionally kill Daveon Lee while the defendant was an active participant in a criminal street gang, and that the murder was *carried out to further the activities of the criminal street gang*." (Italics added.)

The Attorney General contends that based on this language and "the totality of the evidence presented, the balance of the jury instructions provided, the arguments to the jury by counsel, [and] the jury's other findings" under other instructions, the jury determined that Gray committed the murder to further his gang's criminal activities.

This argument ignores the applicable reasonable doubt standard. (*Mil*, *supra*, 53 Cal.4th at p. 417.) While other instructions required the jury to determine whether Gray actively participated in his gang, none instructed the jury to resolve the contested question whether Gray killed Lee for a gang purpose. There is no authority for

18

instructing the jury on that essential question in a verdict form, which the trial court gave to the foreperson to fill out, not the jury as a whole.

The trial court did not direct the jury to view the verdict forms as substitute or supplemental jury instructions, but instead simply stated: "You will be given verdict forms. As soon as all jurors have agreed on a verdict, *the foreperson* must date and sign the appropriate verdict forms and notify the deputy." (Italics added.) A bare verdict form is manifestly not the trial court's instruction on a particular topic, but instead only a means for the jury to communicate to the court its *conclusion*, assuming it has been properly instructed. But the trial court provided no instruction on the essential gang-murder question here. Nor do the arguments of counsel suffice, since the trial court directs the jury to follow the court's instructions, and we therefore presume the jury looks to the trial court and not to counsel for instructions on the questions it must resolve. (*People v. Clair* (1992) 2 Cal.4th 629, 662-663.) In sum, in the absence of any instruction on the gang murder special circumstance, the jury's true finding on that circumstance must be reversed.

2.     The Trial Court's Oral Modification of the "Kill Zone" Instruction Does Not Require Reversal of the Attempted Voluntary Manslaughter Conviction

Gray argues the trial court erroneously answered a jury question concerning the "kill zone" concept in the court's attempted murder instruction (CALCRIM No. 600), and thereby violated his constitutional right to due process and a jury trial under correct legal instructions. The Attorney General argues the issue is moot because the jury acquitted Gray of attempted murder. But Gray's conviction was based on a theory of attempted murder mitigated to attempted voluntary manslaughter by a sudden quarrel or heat of passion (CALCRIM No. 603) or by unreasonable self-defense (CALCRIM No. 604). Therefore we will address the issue.

The Attorney General also argues Gray forfeited this instructional challenge by failing to object to the trial court's proposed answer or to claim error and seek

19

reinstruction after the trial court answered the jury's question. But the argument is not forfeited because the trial court framed its answer as a "modification to the instructions you have," and errors in the instructions may affect the defendant's substantial rights (§ 1259), requiring no objection for appellate review (e.g., *People v. Hillhouse* (2002) 27 Cal.4th 469, 503). We find no reversible error here, however, because when read together, the trial court's oral and written instructions correctly stated the law.

The issue arose in relation to the "kill zone" instruction the trial court gave the jury on the attempted murder charge. As the Supreme Court has explained, "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*People v. Smith* (2005) 37 Cal.4th 733, 745-746.)

The high court has provided other illustrations of the "kill zone" concept: "For example, if a person placed a bomb on a commercial airplane intending to kill a primary target, but also ensuring the death of all the passengers, the person could be convicted [under the kill zone theory] of the attempted murder of all the passengers, and not only the primary target." (*People v. Stone* (2009) 46 Cal.4th 131, 137 (*Stone*).) The court has also cautioned, however, that the "'kill zone' theory 'is not a legal doctrine requiring special jury instructions. . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' [Citation.]" (*Ibid.*, quoting *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6.) Accordingly, "[i]t is . . . *impossible* for a trial court to commit error, much less prejudicial error, by *declining* to give a kill zone instruction." (*People v. McCloud* (2012) 211 Cal.App.4th 788, 803, second italics added.)

20

Here, during deliberations, the foreperson sent the trial court the following note: "In the final paragraph of Instruction 600 'Attempted Murder' it reads[:] 'In order to convict the defendant of the attempted murder of Kendayl Richburg, the People must prove that the defendant either intended to kill her or intended to kill everyone within the kill zone.' Our questions are what/where is the kill zone? The entire house or just [the] upstairs window? What is meant by everyone? Were the People charged w/ proving that the defendant intended to kill 100+ people? Finally, is the charge to be read as Kendayl Richburg OR everyone as opposed to Kendayl AND everyone? Or anyone? Would it be possible to hear the closing arguments once more?"

The trial court convened the jurors and counsel in the courtroom, and answered the jury's questions as follows: "Good morning, ladies and gentlemen. I got your note. Sorry for the delay. We needed to gather up everyone, and we are all now convened. [¶] The question you have asked is a very good one. Because this is a concept that is relatively new in the law, this concept of the, quote, unquote, 'kill zone.' [¶] For years, it has long been held in California that the concept of transferred intent, which you're familiar with, with respect to the murder count, did not apply to attempted murder. But in recent years, this concept of the kill zone has been developed and it applies specifically to the area of homicide, and most specifically to attempted murder, and the law is continually evolving in that area. And I'm going to give you kind of a modification to the instruction that you have. And this modification of what I'm about to read to you is language from a California Supreme Court decision. And the Supreme Court is the ultimate decisionmaker in terms of legal issues in California."

The trial court continued: "And so to — what you have in the instruction I already gave you, consider this: [¶] 'As indicated, the transferred intent — the concept of transferred intent does not apply to attempted murder but still permits a person who shoots at a group of people to be punished for the actions toward everyone in the group even if that person primarily targeted only one of them.' [¶] Now, the second part of

21

your question is just what constitutes a kill zone. Thus far, the courts have not given us a definition of what constitutes a kill zone. It could be a very small area; it could be a very large area. But the definition I am gonna [*sic*] give you I think is based kind of on reason and logic. It's anything in the vicinity of the area in which the shots are being fired at a potential target."

The trial court went further and added: "So it could include, for your question, the window. It could include the garage. It could include anywhere in the house where shots were actually fired. You heard testimony that there were bullet holes or bullet strikes in the garage. You're aware that there was testimony that a bullet went through the window upstairs on the second floor, and there were shots just basically all over the place. *So I think you can just generally consider the 'kill zone,' quote, unquote, to be anything in the immediate vicinity there where the shots were fired*." (Italics added.)

When the trial court asked the jury if its response clarified the jury's questions, two jurors spoke up in the following manner: "TJ12: You wanted to clarify the 'and/or'? [¶] TJ03: As far as Kendayl Richburg. It says, "[For attempted murder, the People must prove that the defendant intended to kill her] '*Or* everyone.' [Italics added.] And we wanted to know what that means by 'Everyone.['] Everyone or anyone[?]"

The court explained in a continuing dialogue with the jury: "Anyone — her or anyone within the kill zone. Anyone and/or everyone. [¶] TJ03: So we should read that 'everyone' to be 'anyone'? Or should we read it to be [defendant intended to kill] 'everyone' [in the kill zone]? [¶] TJ09: And/or everyone. [¶] The Court: And/or everyone. Read it that way. [¶] TJ08: That's what I was — everyone or anyone? [¶] The Court: Anyone and/or everyone." The court also explained the attorneys' closing arguments would not be read back to the jury because "[w]hat the attorneys say is not evidence," and the jury broke for lunch before resuming deliberations.

22

Gray contends the trial court's oral "kill zone" instruction erroneously substituted an intent to kill "anyone" for "everyone." Gray argues "[t]he 'kill zone' doctrine, which is an application of concurrent specific intent to kill, requires the intent to kill *everyone*, not just *anyone*, within the kill zone." Gray seems to suggest that even if the jury concluded Gray *only* intended to kill B or the host and specifically did not intend to kill other potential targets, the trial court's use of the word anyone meant Gray was guilty of attempted murder not only of his intended targets but *anyone* near them. The Supreme Court has observed, however, that "[i]n context, a jury hearing about the intent to kill *anyone* within the kill zone would probably interpret it as meaning the intent to kill *any* person who happens to be in the kill zone, i.e., *everyone* in the kill zone." (*Stone, supra,* 46 Cal.4th at p. 138, fn. 3.)

Gray argues the trial court's oral modification of the attempted murder jury instruction was erroneous because it defined "kill zone" in a manner that necessarily included the upstairs bedroom, thereby usurping the jury's role to determine factual issues. In other words, it was for the jury to determine the scope of the physical zone of danger Gray created in allegedly attempting to kill B or the party host who ejected him and his cohort. Gray is correct that the jury must resolve factual conflicts, not the court. Trial courts must tread carefully in answering jury questions and the safest course is often simply to refer the jury to the instructions already given if they are correct. (*People v. Beardslee* (1991) 53 Cal.3d 68, 96-97 [court must weigh reiterating instructions against hazards of striking out on its own].) Here, however, the trial court left for the jury the dispositive question of whether Gray intended to kill the potential victims in the kill zone. As explained in *People v. Pham* (2011) 192 Cal.App.4th 552, 559: "The question — which is a factual one for the jury to decide — is whether, based on the particular evidence in the case, it can be inferred that defendant had the concurrent intent to kill not only his intended target but others in the target's vicinity."

23

Gray does not suggest the initial standard kill zone instruction (CALCRIM No. 600) the trial court furnished to the jury was erroneous. But he seems to assume that in defining the kill zone in its oral remarks to include the bedroom because "shots were fired" there, the trial court determined the issue of Gray's intent posed in the written instruction. Not so.

As the Supreme Court explained in *Stone*, the kill zone theory recognizes the jury may infer the defendant harbors a concurrent intent to kill not just targeted persons, but also those in a zone of harm near those targeted. (*Stone*, supra, 46 Cal.4th at p. 137.) Accordingly, the trial court's written instruction based on CALCRIM No. 600 properly instructed the jury: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Kendayl Richburg, the People must prove that the defendant either intended to kill her *or intended to kill everyone within the kill zone*." (Italics added.)

The trial court's oral remarks did not contravene the written instruction or interfere with the jury's role in determining guilt. While the court's remarks necessarily included the upstairs bedroom in the so-called kill zone by defining that zone "to be anything in the immediate vicinity where the shots were fired," we must assume the jury correlated the oral and written instructions. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111 [reviewing court must presume "'"jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given'"'"].) Accordingly, while the court's oral remarks informed the jury the bedroom fell within the kill zone, it still remained for the jury to determine whether "the defendant … *intended to kill* everyone within the kill zone." (CALCRIM No. 600, italics added.) Thus, the core question in CALCRIM No. 600 of ascertaining Gray's intent properly remained for the jury to decide.

24

Gray suggests that in defining "kill zone" in a manner to necessarily include the bedroom, the trial court essentially determined Gray intended to kill everyone in that zone, and implicitly communicated that determination to the jury. But reference to a "kill zone" in the court's instructions did not relieve the jury of determining whether Gray harbored the specific intent to kill everyone in that zone. Rather, the trial court's oral and written instructions correlated together asked the jury to determine whether the defendant "*intended to kill*" those "within the kill zone." (CALCRIM No. 600, italics added.) Consequently, the trial court's oral instruction left to the jury the crucial task of determining whether Gray intended kill those in the kill zone, whatever its boundaries. Gray's instructional challenge therefore fails.

3.      No Sua Sponte Duty to Instruct on Multi-Gang Nexus in this Case

In supplemental briefing, Gray contends the trial court erred in failing to instruct the jury sua sponte that it must find a collaborative or organizational nexus between gangs before relying on one of the gang's actions to support the predicate acts and primary activities necessary to constitute a criminal street gang. Gang allegations (e.g., §§ 186.22, subd. (b); 190.2, subd. (a)(22); 12022.53, subd. (e)) apply only where a gang qualifies as a "criminal street gang" (§ 186.22, subd. (f)) based on its "primary activities" (*ibid.*) and on predicate acts that constitute a "pattern of criminal gang activity" (*ibid.*). In a case arising after Gray's trial, the Supreme Court is currently considering whether evidence of a collaborative or organizational nexus is required before multiple subsets of the Norteños gang can be treated as a whole for the purpose of determining whether the subsets or whole constitute a criminal street gang within the meaning of section 186.22, subdivision (f). (*People v. Prunty* (2013) 214 Cal.App.4th 1110, review granted June 26, 2013, S210234.)

Here, the prosecution's gang expert provided a brief epidemiology of a subset of Los Angeles gangs when he explained the Westside Hoover Crips split off from

25

the Westside Crips in the mid-1970's, soon dropped "Westside" and became known as the Hoover Crips, and later created further "subsets along Hoover Avenue." These subsets "primarily went on blocks where people were living. They started down at 52nd Street and called themselves 5 Deuce, for 5-2, 5 Deuce Hoover Crips. . . . [¶] Then they went all the way up to 112 Street, which is called 11 Deuce Criminals," and in between those streets, among eight Hoover subsets, Gray's subset was known variously as the "94 Blocc," "9-4," the "9-4 set," and the "94 Hoover Criminals Gang."

The expert explained that by the mid-1990's, the Hoover Crips developed rivalries with both the Bloods and Crips criminal street gangs, and therefore generally dropped "Crip" from their gang name and became known as the Hoover Criminals." The 9-4 set alone included 86 documented members. A sampling of gang paraphernalia recovered in Gray's bedroom included a shoebox bearing Hoover graffiti stating "One Nation Hoova Gr94ver [*sic*]" and identifying all eight subsets of the Hoover Criminals gang. As noted, evidence showed Gray and his cohort yelled, "This is motherfucking Hoover," as they jumped the fence to enter the garage and begin their attack.

The expert acknowledged that the two predicate murders on which the prosecution relied to establish a pattern of criminal gang activity were not committed by 94 Hoover set members. Rather, the female perpetrator "was an active member of the 112th, or 11-Deuce. And Mr. Greer was 10-7 Hoover."

Gray's challenge fails, however, because he stipulated these two murders constituted predicate acts satisfying the requisite pattern of criminal gang activity. Accordingly, the trial court's jury instruction reflected Gray's stipulation to the requisite gang predicate offenses, as follows: "A pattern of criminal gang activity, as used here, means: [¶] 1. The commission of murder by Antonio Lamar Greer on October 24, 2000 [*See stipulation*]; and the commission of murder by Kiera Sheree Newsome on April 16, 2001 [*See stipulation*]." (Original brackets and italics.)

26

Gray now argues on appeal that the stipulation was "binding only as to the truth of the convictions" and was "merely 'admissible' for purposes of proving that 94 Hoovers was a criminal street gang." Consequently, he asserts the trial court should have instructed the jury to determine whether the admitted evidence established a collaborative or organizational nexus among the Hoover subsets that would allow the jury to consider these murders in determining whether Gray's 94 Hoovers itself met the statutory requirements for a criminal street gang. The record, however, demonstrates Gray stipulated the two murders constituted the necessary predicate acts to satisfy the pattern element of a criminal street gang. Gray may not disavow his stipulation on appeal, and therefore his challenge fails. Additionally, he does not provide any explanation concerning his challenge regarding 94 Hoover's primary activities, which the evidence amply showed included murder, attempted murder, robbery, and assault with a deadly weapon. (See *People v. Vy* (2004) 122 Cal.App.4th 1209, 1225-1226 [current offenses substantiate gang's primary activities].) His primary activities challenge is therefore forfeited.

C.    *Verdict and Sentencing Challenges*

1.    Delayed Polling of All Jurors Does Not Require Mistrial

Gray argues we must reverse the jury's prior murder special circumstance finding (see § 190.2, subd. (a)(2) [prescribing death sentence or LWOP if "defendant was convicted previously of murder in the first or second degree"]) because the trial court failed to accept the jury's initial "not true" finding. According to Gray, the trial court erroneously rejected the "not true" finding instead of recording it immediately, coercively directed the jury to return to the jury room to continue deliberating, and mistakenly polled the jury on their first "not true" finding only *after* the jury returned with its second verdict.

27

The record shows, however, that the trial court upon receiving the jury's initial verdict effectively polled the foreperson immediately by asking her to read the jury's verdict, and properly sent the jury back to the jury room when the foreperson responded, "Oh yeah.  We want the other one."  The trial court may poll the jury to determine whether the verdict form reflects the jury's verdict, and under section 1163, if "any *one* [juror] answer[s] in the negative, the jury must be sent out for further deliberation."  (Italics added.)  That is what happened here when the foreperson declared the form she submitted to the trial court did not accurately reflect the jury's verdict, and the trial court therefore did not err in sending the jury back to the jury room.

*People v. Carbajal* (2013) 56 Cal.4th 521, 530 (*Carbajal*) recently summarized the "detail[ed] . . . procedures that trial courts must follow in receiving a jury verdict."  Specifically, section 1147 provides that "[w]hen the jury have agreed upon their verdict, they must be conducted into court by the officer having them in charge."  Section 1149 provides that "[w]hen the jury appear[s] they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, *they must, on being required, declare the same*."  (Italics added.)  And section 1161 specifies that "when there is a verdict of acquittal, the Court cannot require the jury to reconsider it," while in contrast, "[w]hen there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict, and if, after the reconsideration, they return the same verdict, it must be entered[.]"

Section 1163, however, provides that even as to apparent acquittals, "[w]hen a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation."  And section 1164, subdivision (a), similarly provides that "[w]hen the verdict given is receivable by the court, the clerk shall record it in full upon the minutes,

and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete . . . ."

As *Carbajal* explained, "These provisions are intended to reduce the likelihood of a trial court unduly, even if inadvertently, influencing the jury to reach a particular outcome. [Citations.] The mechanical, prescriptive character of the process for eliciting and receiving a jury verdict reflects the Legislature's judgment that the risk of jury coercion outweighs the risk of jury error. The procedural requirements set forth in the statutory scheme apply regardless of whether a reviewing court can discern that there was no *actual* coercion of the jury by the trial court." (*Carbajal*, *supra*, 56 Cal.4th at p. 531.)

*Carbajal* also clarified that while "there is case law permitting a trial court to clarify an 'ambiguous' verdict," that is limited to instances where the verdict is "unintelligible," for example where the jury finds the defendant both guilty and not guilty "*on the same count*." (*Carbajal*, *supra*, 56 Cal.4th at p. 532, original italics.) Thus, the trial court "may seek clarification where a jury finds the defendant guilty of a greater offense but not guilty of a lesser included offense" because in such circumstances "it [i]s not possible to understand whether the jury had actually convicted or acquitted the defendant of the specified counts." (*Ibid.*) But other instances of "[m]ere inconsistency" or ambiguity in a verdict "do[] not provide a valid reason for courts to reject a jury verdict." (*Ibid.*) Here, Gray's challenge does not arise from an inconsistency or ambiguity in the jury's initial verdict, but rather in the manner the trial court received the verdict and polled the jury.

Specifically, in the bifurcated proceeding on the prior murder conviction special circumstance, the jury heard evidence of Gray's earlier conviction in 2006 for first degree murder, consisting of Department of Corrections and Rehabilitation case records that included Gray's fingerprints and the testimony of a fingerprint examiner

29

opining that Gray's fingerprints matched those in the case records reflecting his earlier conviction. The jury retired to deliberate on the prior murder special circumstance allegation, and within a half hour notified the court through the bailiff that it had reached a verdict. The following colloquy occurred: "The Court: Good morning, once again. [¶] The jury has returned. [¶] Madam foreperson, if you will hand the verdict forms to the deputy. [¶] Thank you. [¶] The Deputy: You're welcome. [¶] The Court: Superior Court of California, County of Riverside. People of the — [¶] If you will return that. [¶] Did you take a look at that to see if you — read that carefully. [¶] TJ12: Oh, yeah. We want the other one. [¶] The Court: Is it back in the — [¶] TJ12: Yeah. [¶] The Court: — jury room? [¶] Why don't — let's send them back there. All right. [¶] TJ12: Thank you. [¶] The Court: You should all go."

In this exchange, the trial court received the jury's verdict and immediately asked the foreperson to read the verdict, which the court returned to her to do so. When the foreperson alerted the court, "We want the other one," the court did not poll any other jurors at that time to confirm the foreperson's statement she gave the court the wrong verdict form.

The court and the parties discussed the issue when the jury returned to the jury room. Gray's attorney asked, "What happened," and the court explained that "they signed the not true form." Counsel asked, "Shouldn't you then have taken the verdict," and the court responded, "Well, if I had — and the verdict doesn't become final until I poll them it would be clear that they would all say, no, this is not our verdict. [¶] I will address it with them when they come back. You are right, I probably should have read the verdict. But it was pretty clear to me that they made a mistake. And one reason for that is because the verdict forms, as printed, are confusing. They are hard to — in fact, I had to read it twice. Initially I thought they both said the same thing. It took me the second reading to realize that it didn't. I will address it on the record with them."

Gray's counsel expressed concern that in "handing it back to them, it is implied or said that they made a mistake, and in so perhaps commenting on what you think the verdict should be. Assuming it — maybe it was a mistake, maybe not. I don't know." The court answered: "All right. I think what I am going to do is note that the verdict form that was originally handed to me indicated that they found the allegation not true. And I will ask each juror individually if I had read that verdict to them on the record, then polled them individually as to whether that represented his or her individual verdict — if I had done so, would that have been your verdict? And I think that's all I can do at this point. [¶] After I do that, or now, if you want — do you want to make a motion for a mistrial?" Counsel moved for a mistrial just as the clerk announced the jury's return to the courtroom. It is not clear exactly how long the jurors had been absent, but they had notified the bailiff at 11:17 a.m. of their initial verdict, and after the foreperson's colloquy with the trial court and their return to the jury room, they had completed the second verdict form by 11:24 a.m.

Upon the jury's return, the trial court directed the foreperson to hand the verdict forms to the deputy, noted the "initial verdict form" had stated the jury found the special circumstance allegation untrue, and clarified that in "turning it back to you," the court did not intend to "give[] you the impression that I was trying to dictate to you a specific verdict. That was not my intention at all. [¶] My intention was simply to inquire if in fact that did represent the jury's verdict." The trial court then recited the initial verdict form it had received from the foreperson, and polled each juror whether it represented his or her "individual finding and verdict," and each juror answered, "No." The court asked the foreperson, "Am I safe in assuming that you signed that form by mistake," and the foreperson answered, "Correct." The trial court next recited the new verdict form returned by the jury, and polled each juror whether it represented his or her individual finding, and each juror answered, "Yes." The court ordered "*that* verdict recorded as read." (Italics added.)

31

Relying on *People v. Guerra* (2009) 176 Cal.App.4th 933 (*Guerra*), Gray contends the trial court erred in failing to declare a mistrial on the prior murder special circumstance because the court essentially coerced the jury to reconsider its "not true" finding when it handed the verdict back to the foreperson. We disagree. The circumstances in *Guerra* are dissimilar and do not control the outcome here.

There, "the trial court impermissibly invited the jury to 'reconsider' its not true findings and allowed the jury to deliberate anew. This was in excess of the court's authority." (*Guerra*, *supra*, 176 Cal.App.4th at p. 944.) In *Guerra*, the trial court confronted and attempted to resolve an inconsistency in the jury's verdict: the jury convicted the defendant of seven counts of sex offenses against his daughter and an eighth count involving another child, but found untrue an enhancement allegation that the defendant had committed offenses against more than one victim. (*Id.* at p. 936.) As noted, *Carbajal* later explained that a "[m]ere inconsistency" does not warrant trial court intervention in the "'black box'" of jury decisionmaking. (*Carbajal*, *supra*, 56 Cal.4th at pp. 532, 533.) But in *Guerra*, the trial court parsed the discrepancy for the jury and overstepped its bounds. The court countermanded the jurors, explaining their analysis was faulty when they concluded the multiple victim enhancement did not apply because the defendant did not molest the two victims simultaneously.

As the Court of Appeal in *Guerra* observed, "Given the formality of the setting of a superior court, over which the trial judge presides in a commanding display of authority, and in light of the jurors' respectful and deferential tone toward the trial court as everyone discussed the inconsistent verdict, it is possible to interpret the court's invitation to reconsider the findings as something akin to an order from the jurors' perspective. . . . So it is no surprise that when the court asked, 'would you like to go back into the jury room to discuss that?' the jury foreperson, without, as far as this record discloses, asking any other juror for an opinion, immediately replied, "Yes, sir. We misunderstood." (*Guerra*, *supra*, 176 Cal.App.4th at pp. 943-944.) *Guerra* explained:

32

"To protect defendant's right under section 1161 that 'when there is a verdict of acquittal, the Court cannot require the jury to reconsider it,' while also protecting defendant's right under the same statute not to be convicted of molesting the second victim if the jury had intended to find him not guilty on that count, the trial court should have granted the prosecutor's request to poll the jurors. (See § 1163.)" (*Guerra*, at p. 944.)

Here, the trial court did not intrude on the jury's decisionmaking or otherwise violate the prophylactic statutory procedures for receiving and recording the jury's verdict. Gray discerns a coercive effect in the trial court's act of returning the verdict to the foreperson to "read that carefully," but we cannot agree where the statutory framework itself calls for the jury to "declare" its verdict. (§ 1149.) Section 1149 provides: "Manner of Taking Verdict: When the jury appear[s] they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same." The trial court therefore reasonably could require the foreperson to read the verdict aloud, or re-read it silently before declaring it. If in doing so, the foreperson discovers the verdict form does not reflect the jury's intention, there is no violation if the foreperson or the court or clerk as the jury's designee does not immediately declare the verdict. Failing to read aloud or declare the contents of a verdict form in these circumstances does not block or thwart the jury's intent, but instead effectuates it.

By asking the foreperson to read the jury's verdict, whether aloud or silently, the trial court in practical effect polled the foreperson to see if the verdict form reflected the jury's actual intent. The trial court did not poll the remainder of the jury until after the jury reconvened in the courtroom, but the court could not earlier poll the jury on a verdict the foreperson declined to announce. Even assuming, as defense counsel later suggested, the court could have announced the contents of the initial verdict form and polled all the members of the jury to verify the foreperson's conclusion it was incorrect, failing to do so was harmless. It was harmless because in ascertaining whether

33

the verdict form reflects the jury's verdict, if "any *one* [juror] answer[s] in the negative, the jury *must* be sent out for further deliberation." (§ 1163, italics added.)

In sum, the trial court need not record instantaneously the jury's verdict when the jurors return to the courtroom, but instead may determine whether the verdict form is accurate. (§§ 1163; 1164, subd. (a).) The trial court properly required the foreperson to read the verdict form in the course of declaring the verdict or before it was declared (§ 1149), and when the foreperson stated that the form did not reflect the jury's verdict ("We want the other one"), the court did not err in excusing the jury to fix the form to accurately state its verdict. No mistrial was required, and Gray's challenge therefore fails.

2.  Gun Enhancement

Gray's gun enhancement challenge rests on the fact section 12022.53's mandatory 25-years-to-life firearm enhancement applies not only to personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), but also to a principal who participated in the offense for the benefit of a criminal street gang (*id.*, subd. (e)(1)). Under this provision, the enhancement applies even if Gray was not personally a shooter. Gray claims the firearm enhancement must be stricken here because section 654 bars multiple punishment for the same active gang participation conduct that underlies both the gun enhancement and the gang murder special circumstance defined in section 190.22, subd. (a)(22). In the alternative, he argues section 12022.53 by its terms precludes additional or enhanced punishment beyond the firearm enhancement for conduct committed to benefit a criminal street gang. In other words, he asserts the true finding on the firearm enhancement renders the jury's gang murder special circumstance finding inoperative and toothless. Gray's claims have no merit but, in any event, reversal of the gang murder special circumstance moots Gray's claims.

34

Specifically, given our reversal of the gang murder special circumstance, Gray's punishment is enhanced for his underlying gang participation based only on the firearm enhancement and not under the gang murder special circumstance. Therefore, section 654's bar against double punishment does not apply. Nor does the provision for a single, 25-years-to-life gang enhancement under section 12022.53 in any way preclude the LWOP term the trial court imposed. The mandatory LWOP term was independently grounded in the jury's prior murder special circumstance finding (§ 190.2, subd. (a)(2)), and therefore is unaffected by reversal of the gang murder special circumstance.

Even assuming Gray's challenges were not moot, they fail on the merits. Section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Section 654 articulates a public policy to prevent double punishment for the same criminal act or objective, despite the commission of separate crimes. (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1311.)

But the Legislature may refine state public policy and define the contours of its application. (See, e.g., *In re Marriage of Tavares* (2007) 151 Cal.App.4th 620, 628 ["The Legislature declares state public policy, not the courts"].) The Legislature provided in section 12022.53, subdivision (d), that the 25-years-to-life enhancement shall apply "[n]otwithstanding any other provision of law." Based on this and similar language throughout the statute, the Supreme Court in *People v. Palacios* (2007) 41 Cal.4th 720, 723 (*Palacios*), determined "the sentence enhancement provisions of Penal Code section 12022.53 are not limited by the multiple punishment prohibition of section 654." The high court was "persuaded that, in enacting section 12022.53, the Legislature made clear that it intended to create a sentencing scheme unfettered by section 654." (*Palacios*, at pp. 727-728.) Consequently, section 654 does not apply and any limitation must arise from within section 12022.53 itself.

35

Gray relies on section 12022.53, subdivision (e)(2), which bars imposition of an additional gang enhancement under "Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1" unless the defendant "personally used or personally discharged a firearm in the commission of the offense." Gray argues the gang special circumstance should be considered an enhancement within the meaning of section 12022.53, subdivision (e)(2), because it results in an increased penalty (LWOP or death) based on commission of the murder for a gang purpose. Gray relies on the Supreme Court's general observation in *People v. Brookfield* (2009) 47 Cal.4th 583, 593 (*Brookfield*), where the court noted, "It appears that the Legislature's use of the term 'enhancement' in section 12022.53(e)(2) was intended to refer broadly to any greater term of imprisonment for a crime that, as here, is committed to benefit a criminal street gang."

*Brookfield* is inapposite because it did not involve a gang murder special circumstance, but rather the enhanced prison term prescribed under section 186.22, subdivision (b)(4)(B), for the gang-related offense of shooting at an inhabited dwelling. In any event, by its plain terms, the exclusion for additional gang punishment that Gray relies on in section 12022.53, subdivision (e)(2), does not apply. As noted, it bars imposition of an additional gang enhancement under "Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1" unless the defendant "personally used or personally discharged a firearm in the commission of the offense." But the gang special circumstance is defined in section 190.2, subdivision (a)(22), *not* under section 186.22 or any other provision contained in chapter 11 of title 7 in part 1 of the Penal Code. Rather, section 190.2 and its special circumstance provisions for gang slayings (*id.*, subd. (a)(22)) and multiple murders (*id.*, subd. (a)(2)) falls within chapter 1 of title 8 of part 1 of the same code. Gray's challenge therefore fails.

3. Attempted Voluntary Manslaughter Sentence

Gray correctly observes that because the trial court did not specify whether it imposed the five-year, six-month sentence on count 3 for attempted voluntary manslaughter as a consecutive or concurrent sentence, it is by statutory default imposed concurrently (§ 669). Because the abstract of judgment did not indicate whether the sentence was consecutive or concurrent, we will direct the trial court to amend it accordingly.

Gray also correctly observes that because the trial court did not specify whether his sentence in this case was to be served consecutively or concurrently to the sentence for his prior murder conviction, the sentences are concurrent. The Attorney General suggests we remand for resentencing because the trial court may not have understood it could run the sentences consecutively. The trial court noted: "I should address one more thing: He's currently doing . . . I believe he was sentenced to 50 years to life out of the Los Angeles case. [¶] . . . [¶] It's the Court's intention — well, this LWOP[] sentence, I believe, supersedes that. I think the — I don't know if this court has the authority to order — in fact, I don't think I do — that the L.A. case be served consecutively, but again, the Court will just simply note for the record that he is doing 50 to life out of Los Angeles County." The court earlier had observed, "I wonder if somebody down the line — somebody's going to find a way to serve a consecutive term to life without parole, but we'll leave that for someone higher on the pay scale than me." The court made the comment in imposing the mandatory consecutive firearm enhancement, but it suggests the court regarded as superfluous any additional consecutive term beyond the LWOP term. Accordingly, a new sentencing hearing to have the court consider running Gray's LWOP term in this case and his Los Angeles 50-years-to-life term consecutively would be superfluous. Remand is therefore precluded as an unnecessary, idle gesture.

37

Gray and the Attorney General agree the abstract of judgment should be corrected to reflect that the trial court imposed the upper-term sentence for attempted voluntary manslaughter, not the middle term.

## III

## DISPOSITION

The true finding on the gang murder special circumstance allegation is reversed, and in all other respects, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect the trial court imposed a concurrent sentence and the upper term on the attempted voluntary manslaughter conviction in count 3. The trial court shall prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


ARONSON, J.

WE CONCUR:


O'LEARY, P.J.


THOMPSON, J.


38